In re: AMERCO DERIVATIVE LITIGATION.

GLENBROOK CAPITAL LIMITED PARTNERSHIP; ALAN KAHN; RON BELEC; and PAUL F. SHOEN, Appellants, v. JOHN M. DODDS, an Individual; RICHARD HERRERA, an Individual; AUBREY JOHNSON, an Individual; CHARLES J. BAYER, an Individual; JOHN P. BROGAN, an Individual; JAMES J. GROGAN, an Individual; AMERCO, a Nevada Corporation; EDWARD J. SHOEN, an Individual; JAMES P. SHOEN, an Individual; WILLIAM E. CARTY, an Individual; MARK V. SHOEN, an Individual; SAC HOLDING CORPORATION, a Nevada Corporation; SAC HOLDING CORPORATION II, a Nevada Corporation; THREE SAC SELF-STORAGE CORPORATION, a Nevada Corporation; FOUR SAC SELF-STORAGE CORPORATION, a Nevada Corporation; FIVE SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SIX SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SIX-A SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SIX-B SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SIX-C SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SEVEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; EIGHT SAC SELF-STORAGE CORPORATION, a Nevada Corporation; NINE SAC SELF-STORAGE CORPORATION, a Nevada Corporation; TEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; ELEVEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; TWELVE SAC SELF-STORAGE CORPORATION, a Nevada Corporation; THIRTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; FOURTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; FIFTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SIXTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; SEVENTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; EIGHTEEN SAC SELF-STORAGE CORPORATION, a Nevada Corporation; NINETEEN SAC SELF-STORAGE LIMITED PARTNER-

SHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-ONE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-TWO SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-THREE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-FOUR SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY-FIVE SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY-SIX SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; AND TWENTY-SEVEN SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP, RESPONDENTS.

No. 51629

May 12, 2011 252 P.3d 681

*Lewis & Roca LLP* and *Daniel F. Polsenberg* and *Jennifer B. Anderson*, Las Vegas; *Berman DeValerio* and *Joseph J. Tabacco, Jr.*, and *Christopher T. Heffelfinger*, San Francisco, California; *Latham & Watkins LLP* and *Marc W. Rappel, Brian T. Glennon*, and *Gene Chang*, Los Angeles, California; *Harold B. Obstfeld*, New York, New York; *Robbins Umeda LLP* and *Brian J. Robbins, Kevin A. Seely, Kelly McIntyre*, and *Gregory E. Del Gaizo*, San Diego, California, for Appellants.

*Parsons Behle & Latimer* and *Rew R. Goodenow*, Reno; *Irell & Manella LLP* and *David Siegel, Daniel P. Lefler*, and *Charles E. Elder*, Los Angeles, California, for Respondents John M. Dodds, Richard Herrera, Aubrey Johnson, Charles J. Bayer, John P. Brogan, and James J. Grogan.

*Laxalt & Nomura, Ltd.*, and *Daniel Hayward*, Reno; *Morrison & Foerster, LLP*, and *Jack W. Londen*, San Francisco, California, for Respondent AMERCO.

*McDonald Carano Wilson LLP* and *Thomas R.C. Wilson* and *Matthew C. Addison*, Reno; *Pillsbury Winthrop Shaw Pittman LLP* and *Walter J. Robinson*, Palo Alto, California, for Respondents Edward J. Shoen, James P. Shoen, and William E. Carty.

*Law Offices of Calvin R.X. Dunlap* and *Monique Laxalt* and *Calvin R.X. Dunlap*, Reno; *Squire, Sanders & Dempsey L.L.P.* and *George Brandon* and *Brian A. Cabianca*, Phoenix, Arizona, for Respondents Mark V. Shoen and SAC entities.

Before the Court EN BANC.

# OPINION

By the Court, HARDESTY, J.:

AMERCO is a Nevada corporation controlled by the feuding Shoen family. Its main operating subsidiary is U-Haul International, Inc. AMERCO has engaged in numerous business transactions with the SAC entities, which are real estate holding companies controlled by AMERCO shareholder and executive officer Mark Shoen. Based on several of those transactions, appellants filed the underlying shareholder derivative suit in 2002 against AMERCO's former and current directors, Mark, and the SAC entities, primarily for breach of fiduciary duty and aiding and abetting the breach of that fiduciary duty. However, appellants failed to make a demand for corrective action on the AMERCO board of directors, and subsequently, the district court granted respondents' motion to dismiss for failure to adequately allege demand futility. Appellants appealed that decision, and this court reversed and remanded for reconsideration, after clarifying the demand futility standards. *See Shoen v. SAC Holding Corp.*, 122 Nev. 621, 626, 137 P.3d 1171, 1174-75 (2006). On remand, the district court once again granted respondents' motions to dismiss—this time on two grounds distinct from demand futility: (1) a settlement agreement entered into in 1995 by AMERCO and shareholders who are

not involved in this case, referred to as the *Goldwasser* settlement,[1] barred appellants' derivative claims; and (2) appellants could not pursue derivative claims against the SAC entities on behalf of AMERCO based on transactions in which AMERCO itself participated.

In this appeal, we first address whether a claim-release clause contained in the *Goldwasser* settlement agreement reached by different shareholders several years earlier bars the derivative claims now asserted by appellant shareholders. We conclude that it does not. When a settlement agreement does not contain language exhibiting a clear intent to release future claims, the release clause is limited to the claims that existed at the time the settlement agreement was reached.

Second, we address whether appellant shareholders could bring their derivative claims against the corporation's alleged coconspirators. In doing so, we examine, for the first time, the defense of *in pari delicto*[2] in a corporate context, which first requires an analysis of whether an agent's acts are imputed to the corporation. We also clarify the adverse interest exception to imputation, which provides that when the officers have totally abandoned the corporation's interests, their actions are not imputed to the corporation. We further adopt the sole-actor rule, which operates as an exception to the adverse interest exception in limited circumstances. We conclude that the adverse interest exception and sole-actor rule do not apply in this case. Therefore, without more, the AMERCO officers' alleged actions are imputed to the corporation. We then address whether respondents can assert the *in pari delicto* defense, concluding that this is a question that must be remanded to the district court.

Finally, we address various arguments set forth by respondents regarding alternative grounds for affirming the district court's order of dismissal, including whether the district court properly held that appellants adequately pleaded demand futility, whether appellants sufficiently pleaded their causes of action, and whether appellants' claims are barred by the statute of limitations. We conclude that appellants adequately pleaded demand futility, but the district court must now conduct a proper evidentiary hearing regarding whether the evidence supports appellants' allegations; ap-

---

[1] The lead plaintiffs in the lawsuit that resulted in the 1995 settlement were named Goldwasser, and thus, the parties and the district court refer to it as "the *Goldwasser* settlement."

[2] The *in pari delicto* defense precludes a party who has engaged in wrongdoing from recovering when they are at least partially at fault. *Official Committee v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001).

pellants sufficiently pleaded some, but not all, of their claims; and whether the statute of limitations has run is a question of fact for the district court. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS

To put our discussion in context, we present an overview of the factual and procedural background of this case.[3] AMERCO, a Nevada corporation, is the parent company of U-Haul, which Leonard Samuel (L.S.) Shoen founded in 1945. Through wholly owned U-Haul centers and other independent dealers, AMERCO rents trucks, trailers, and storage units to the public. AMERCO's other subsidiary, AMERCO Real Estate Corporation (AREC), controls "the purchase, sale and lease of properties used by AMERCO." Several years before the instant litigation began, L.S. transferred most of his AMERCO stock to his children, leading "to an unfortunate and well-documented family feud between shifting factions for corporate control." *Shoen*, 122 Nev. at 627, 137 P.3d at 1175. At the center of the feud are L.S.'s sons, appellant Paul and respondents Edward J. (Joe), James, and Mark Shoen.

Joe, James, and Mark created SAC Self-Storage Corporation and Two SAC Self-Storage Corporation in 1993 to serve as real estate holding corporations. The common stock issued by the two corporations was split evenly between Joe, James, and Mark. However, in December 1994, a short time before Joe and James filed for personal bankruptcy, they sold their shares to Mark, allegedly for $100. After this transaction, Mark Shoen owned and controlled SAC Self-Storage Corporation and Two SAC Self-Storage Corporation. In 1996, these two entities were merged into a new corporation called Three SAC. Since 1996, many additional SAC corporations or partnerships have been formed under Nevada law (referred to here as the SAC entities), and Mark controls each one.

In 2002 and 2003, Paul and other appellant shareholders Ron Belec, Alan Kahn, and Glenbrook Capital Limited Partnership filed individual derivative suits, which were subsequently consolidated, against Joe, James, and Mark, as well as against current and former AMERCO directors Charles Bayer, William Carty, John Dodds, Richard Herrera, Aubrey Johnson, John Brogan, and James Grogan. Appellants alleged that respondents breached their fiduciary obligations to AMERCO by engaging in improper and unfair transactions with the SAC entities to AMERCO's detri-

---

[3]A more detailed account of the factual background can be found in our previous opinion in this matter, *Shoen v. SAC Holding Corp.*, 122 Nev. 621, 627-31, 137 P.3d 1171, 1175-78 (2006).

ment. The district court dismissed the complaints on the ground that demand futility was not pleaded adequately, *Shoen*, 122 Nev. at 626, 137 P.3d at 1175, and on appeal, this court "clarif[ied] the pleading requirements for shareholder derivative suits pursuant to NRCP 23.1" and remanded the case to the district court "for further proceedings regarding demand futility." *Id.* at 644-45, 137 P.3d at 1186-87.

*District court proceedings on remand*

Upon reversing and remanding the matter in *Shoen*, appellants were permitted to file an amended complaint. *Id.* at 645, 137 P.3d at 1187. In the amended complaint, appellants set forth six causes of action. Appellants alleged: (1) breach of the fiduciary duty of loyalty by engaging in self-dealing against all of the former directors, (2) aiding and abetting a breach of the fiduciary duty of loyalty and unjust enrichment against the SAC entities, and (3) usurpation of corporate opportunities against Mark. Against all respondents, appellants also alleged: (1) engaging in ultra vires acts, (2) wrongful interference with AMERCO's prospective economic advantage, and (3) abuse of control. Appellants stated that they were "seek[ing] to halt and unwind a series of self-dealing transactions" that have resulted in the transfer of "hundreds of self-storage properties and over $200 million of equity away from AMERCO to" the SAC entities. Appellants contended that these were corporate opportunities that AMERCO was deeply focused on prior to the creation of the SAC entities. Thus, according to appellants, Joe, James, and Mark (with assistance from the other respondents) have benefited the SAC entities to AMERCO's detriment.

In their amended complaint, appellants alleged that AMERCO's transactions with the SAC entities were improper for three reasons. First, appellants contended that AMERCO sold properties to the SAC entities at unfairly low prices and failed to seek approval for the transactions from the AMERCO board of directors. The price for most self-storage properties was generally "calculated at 'acquisition cost plus capitalized expenses,'" which appellants alleged was unfair because, among other things, it failed to account for appreciation in the properties between the time AMERCO acquired them and the time it sold them to the SAC entities.

Second, appellants alleged that AMERCO financed the SAC entities' purchase of other properties by providing over $600 million in nonrecourse loans. Appellants contended that some of the loans occurred during financial downturns "when AMERCO was in need of capital for its own business."

Third, appellants alleged that AMERCO entered into management agreements, pursuant to which U-Haul operates self-storage facilities on behalf of the SAC entities. For each property that the

SAC entities acquired, they entered into a "management agreement" with U-Haul. Under these agreements, U-Haul is responsible for running the self-storage businesses, and in return, U-Haul receives a "'management fee,' equal to six percent of the 'gross revenue' generated from the self-storage property." Appellants alleged that such an arrangement is inequitable because the remaining 94 percent of revenue "is kept by [Mark Shoen] and the SAC [e]ntities."

Moreover, appellants alleged that AMERCO's public filings misled its shareholders regarding the SAC transactions. Appellants alleged that AMERCO's annual reports, quarterly reports, and proxy statements for fiscal years 1995 through 2002 referred to the SAC entities in a distorted and confusing manner, without any of the context necessary to understand the nature or scope of the relationship between AMERCO and the SAC entities. Additionally, appellants contended that AMERCO never disclosed how much revenue was collected from the SAC entities or discussed the transactions in its public filings.

Regarding demand futility, appellants set forth in the amended complaint several reasons why demand on AMERCO's board of directors would be futile. First, appellants alleged that "a majority of the board has a material interest in the subject of the demand." Second, appellants contended that Joe, James, and Mark "dominate and control the AMERCO Board," and thus the board is not independent of Joe, James, and Mark.[4]

AMERCO, acting through its board of directors, filed a motion to dismiss appellants' derivative action for failure to allege demand futility adequately. All other respondents also filed motions to dismiss appellants' amended complaint, based on the *Goldwasser* waiver and release in the *Goldwasser* settlement agreement, the *in pari delicto* doctrine, failure to state claims upon which relief may be granted, and the statute of limitations. The district court denied AMERCO's motion to dismiss, finding that appellants "satisfied the heightened pleading requirements of demand futility by showing a majority of the members of the AMERCO Board of Directors were interested parties in the SAC transactions." The district court also scheduled a hearing for all issues, except demand futility, raised in the other respondents' motions to dismiss. Before recounting the hearing and the district court's subsequent ruling on the motions to dismiss, it is necessary to examine briefly the derivative suit that eventually resulted in the *Goldwasser* settlement.

---

[4]Appellants also argue that demand is excused because they alleged ultra vires acts. *See Shoen*, 122 Nev. at 642-43, 137 P.3d at 1185. While "[d]emand futility analysis is conducted on a claim-by-claim basis," *Beam ex rel. M. Stewart Living v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), as discussed hereafter, appellants have failed to state a claim for ultra vires acts.

### The Goldwasser settlement

The events giving rise to the *Goldwasser* settlement began in 1988 when several shareholders filed suit in Arizona (the Arizona litigation), challenging a stock transaction that gave control of AMERCO to Joe, James, and Mark. The Arizona litigation resulted in a billion-dollar jury verdict in favor of the plaintiffs.

Subsequently, in 1994, AMERCO shareholders from the Arizona litigation, the *Goldwasser* plaintiffs, filed a shareholder derivative suit on behalf of AMERCO in federal court in Nevada against AMERCO management, including Joe, James, Mark, Bayer, Carty, Dodds, and Herrera. The *Goldwasser* plaintiffs sought, in part, an injunction to prevent Joe, James, and Mark from causing AMERCO to indemnify them in the judgment from the Arizona litigation. During discussions between the parties' counsel, the *Goldwasser* plaintiffs questioned the propriety of the diversion of corporate assets from AMERCO to the two SAC entities then in existence. The parties ultimately reached a settlement agreement in 1995. To assuage the *Goldwasser* plaintiffs' concerns regarding the SAC entities, a letter from AMERCO describing the SAC transactions was included in the agreement, and the settlement agreement contained a release clause whereby the *Goldwasser* plaintiffs agreed to release various claims against the defendants, including those claims related to matters addressed in the letter describing the SAC transactions.

### District court hearing on the motions to dismiss

After the hearing on the alternative bases alleged for dismissal, the district court granted respondents' motions to dismiss on two separate grounds. First, the district court determined that "the *Goldwasser* settlement released the claims which are the subject of this action." The court reasoned that because the *Goldwasser* plaintiffs raised derivative claims on behalf of AMERCO, the released claims, including those related to the letter describing the SAC transactions, "were released on behalf of [AMERCO]" and "therefore, [appellants] cannot relitigate said claims on behalf of [AMERCO]." Second, the district court found that appellants could not derivatively sue the SAC entities. The court reasoned that because AMERCO "participated in the challenged transactions," appellants cannot file a derivative claim on AMERCO's behalf for those transactions. This appeal followed.

### DISCUSSION

### Standard of review

A district court order granting a motion to dismiss "is rigorously reviewed." *Shoen*, 122 Nev. at 634-35, 137 P.3d at 1180. To

survive dismissal, a complaint must contain some "set of facts, which, if true, would entitle [the plaintiff] to relief." *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). Like the district court, this court considers all factual assertions in the complaint to be true and draws all reasonable inferences in favor of the plaintiff. *Shoen*, 122 Nev. at 635, 137 P.3d at 1180. This court applies de novo review to the district court's legal determinations. *Buzz Stew*, 124 Nev. at 228, 181 P.3d at 672.

*The Goldwasser settlement did not release appellants' claims*

The first ground upon which the district court granted respondents' motions to dismiss was that the claim-release clause in the *Goldwasser* settlement agreement precludes appellants' present claims. Appellants argue that the district court erred because the release clause was limited to claims in existence at the time that the parties reached the settlement agreement and did not apply to claims, like those asserted below, arising out of future transactions. We agree.

Because settlement agreements are contracts, they are "governed by principles of contract law." *Mack v. Estate of Mack*, 125 Nev. 80, 95, 206 P.3d 98, 108 (2009). Under contract law generally, when a release is unambiguous, we must construe it from the language contained within it. *Chwialkowski v. Sachs*, 108 Nev. 404, 406, 834 P.2d 405, 406 (1992). Our ultimate goal is to effectuate the contracting parties' intent, however, when that intent is not clearly expressed in the contractual language, we may also consider the circumstances surrounding the agreement. *Sheehan & Sheehan v. Nelson Malley & Co.*, 121 Nev. 481, 487-88, 117 P.3d 219, 223-24 (2005). Typically, "[c]ontractual release terms . . . do not apply to future causes of action unless expressly contracted for by the parties." *Clark v. Columbia/HCA Info. Servs.*, 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001). We apply de novo review to contract interpretation issues. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005).

The *Goldwasser* settlement agreement's definition of released claims refers to those "*that have been or that could have been* asserted in the Litigation or in the securities actions with which the Litigation is consolidated." (Emphasis added.) The released claims thus include unknown claims, which are "any Released Claims which AMERCO or any Plaintiff does not know or suspect to exist in his, her or its favor, or derivatively in favor of AMERCO, *at the time of the release*." (Emphasis added.) The agreement then states that "AMERCO and the Plaintiffs . . . shall be deemed to have . . . fully, finally and forever settled and released any and all

Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, *which now exist or heretofore have existed.*'' (Emphasis added.)

We conclude that these clear and explicit terms limit the release to claims that were in existence at the time the *Goldwasser* settlement agreement was reached, including any claims related to the transactions with the two SAC entities that existed at that time, even if the facts giving rise to those claims had not yet been discovered. However, we conclude that claims arising out of any SAC transactions that occurred after the date of the release are not included in the release. Even if, as respondents contend, AMERCO indicated to the *Goldwasser* plaintiffs that future SAC transactions would occur, we reject the notion that claims arising from those prospective transactions were released. Not only does the agreement lack language that indicates any intent to release such future claims, but the express language refers to claims that existed at the time of the settlement agreement. Accordingly, we conclude that appellants' derivative claims, which arose out of SAC transactions that occurred post-*Goldwasser*, were not released in the settlement agreement. Thus, we affirm the district court's dismissal of appellant's derivative claims related to AMERCO's transactions with the two SAC entities, but we reverse that portion of the district court's order finding that the *Goldwasser* settlement agreement precludes appellants from pursuing the derivative claims on behalf of AMERCO pertaining to post-*Goldwasser* SAC transactions.

*Appellants' claims against the SAC entities are not necessarily barred by the in pari delicto doctrine*

The district court granted respondents' motions to dismiss appellants' claims against the SAC entities on the ground that appellants lacked standing. As a preliminary matter, the district court's perception of this defense as a standing issue is somewhat flawed. The district court apparently imputed respondents' actions to AMERCO and relied on the *in pari delicto* doctrine to find that appellants' derivative claims filed on behalf of AMERCO were precluded because AMERCO ''participated in the challenged transactions and, therefore, cannot bring a claim against the SAC entities based on the transactions.''

Although some courts conflate the concepts of standing and *in pari delicto*, we conclude that they are subject to separate analyses. The Second Circuit Court of Appeals has treated claims against a third party where wrongdoing was imputed to the corporation as an issue of standing, concluding that the corporation cannot bring a claim under those circumstances. *Shearson Lehman Hutton, Inc. v.*

*Wagoner*, 944 F.2d 114, 117-20 (2d Cir. 1991). However, this approach has been criticized, even within the Second Circuit, for mischaracterizing the *in pari delicto* defense as part of the standing analysis. *See In re Senior Cottages of America, LLC*, 482 F.3d 997, 1003 (8th Cir. 2007). Generally, " '[s]tanding consists of both a "case or controversy" requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional "prudential" element.' " *Official Committee v. R.F. Lafferty & Co.*, 267 F.3d 340, 346 (3d Cir. 2001) (alteration in original) (quoting *The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir. 2000)). This analysis does not include consideration of equitable defenses, such as *in pari delicto*, as these issues are "two separate questions, to be addressed on their own terms." *Id.*

Although state courts do not have constitutional Article III standing, "Nevada has a long history of requiring an actual justiciable controversy as a predicate to judicial relief." *Doe v. Bryan*, 102 Nev. 523, 525, 728 P.2d 443, 444 (1986). In Nevada, as in the federal courts, this standing analysis is separate from the existence of an equitable defense, such as *in pari delicto*. Therefore, "the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties, though it may well give rise to a defense that will be fatal to the action." *In re Senior Cottages of America, LLC*, 482 F.3d at 1004; *see also In re American Intern. Group, Inc.*, 965 A.2d 763, 824 n.234 (Del. Ch. 2009) (recognizing that standing and *in pari delicto* are separate rules); *Reneker v. Offill*, 2009 WL 804134, at *6 n.6 (N.D. Tex. Mar. 26, 2009) (noting that *in pari delicto* is a defense to the merits of a claim but does not preclude a party's standing to bring that claim in the first place and that standing and the existence of equitable defenses are two separate issues). Thus, we conclude that the district court improperly concluded that AMERCO could not bring its claims because AMERCO's alleged participation in wrongdoing does not divest it of standing.

### The in pari delicto doctrine

We have previously recognized the *in pari delicto* doctrine as an equitable defense in actions between individuals. *Shimrak v. Garcia-Mendoza*, 112 Nev. 246, 251-52, 912 P.2d 822, 826 (1996); *Magill v. Lewis*, 74 Nev. 381, 386, 333 P.2d 717, 719 (1958). However, we have not previously addressed the *in pari delicto* doctrine as it applies to corporations and shareholder derivative suits, and we take this opportunity to do so.

When a party suffers injury from wrongdoing in which he engaged, the doctrine of *in pari delicto* often prevents him from re-

covering for his injury. *Lafferty*, 267 F.3d at 354; *American Intern. Group, Consol. Deriv. Lit.*, 976 A.2d 872, 883 (Del. Ch. 2009). The rationale underlying the doctrine "is that there is no societal interest in providing an accounting between wrongdoers." *American Intern. Group*, 976 A.2d at 882. Permitting corporations to sue their coconspirators would not only force courts to apportion blame between wrongdoers, but it would also "diminish[ ] corporate boards' incentives to supervise their own agents." *Id.* at 889; *see also Shimrak*, 112 Nev. at 251, 912 P.2d at 825 ("[T]raditionally neither courts of law nor equity will interpose to grant relief to parties to an illegal agreement.").

In assessing whether the *in pari delicto* doctrine applies to a derivative action against a corporation, we must first determine whether acts of a director or officer are imputed to the corporation and then address the elements of the *in pari delicto* defense. Under basic corporate agency law, the actions of corporate agents are imputed to the corporation. *Strohecker v. Mut. B. & L. Assn.*, 55 Nev. 350, 355, 34 P.2d 1076, 1077 (1934). In *Strohecker*, we noted that

> A corporation can acquire knowledge or receive notice only through its officers and agents, and hence the rule holding a principal, in case of a natural person, bound by notice to his agent is particularly applicable to corporations, the general rule being that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all the material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation.

*Id.* (internal quotations omitted). The rationale for imputing an agent's acts to the corporation is to encourage corporate managers to carefully select and monitor those who are acting on the corporation's behalf. *In re American Intern. Group, Inc.*, 965 A.2d at 825 n.237. However, if an agent is acting on his own behalf, the agent's acts will not be imputed to the corporation. *Keyworth v. Nevada Packard Co.*, 43 Nev. 428, 439, 186 P. 1110, 1113 (1920). This exception is known as the "adverse interest" exception and, although we recognized the exception in *Keyworth*, we have not previously set forth its proper application. We do so now.

We now hold that the agent's actions must be completely and totally adverse to the corporation to invoke the exception. *See*

*Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010). Requiring total abandonment of the corporation's interest renders the exception very narrow. "This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party." *Id.* If the agent's wrongdoing benefits the corporation in any way, the exception does not apply. *Id.* ("Where the agent is perpetrating a fraud that will benefit his principal, th[e] rationale [of not imputing the agent's acts] does not make sense."); *see also American Intern. Group*, 965 A.2d at 824 (holding that the adverse interest exception only applies when the agent acts completely for his own purpose). Simply because an agent has a conflict of interest or is acting mostly for his own self-interest will not invoke the exception. *American Intern. Group*, 965 A.2d at 824.[5]

We also recognize a limited exception to the adverse interest exception whereby an agent's actions are imputed to the corporation even if the agent totally abandons the corporation's interest. Pursuant to the "sole actor" rule, the adverse interest exception will not preclude imputation if the agent is the sole agent or sole shareholder of a corporation. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997); *Lafferty*, 267 F.3d at 359 ("The general principle of the 'sole actor' exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests."). The rule also applies when there are multiple owners and managers who are each engaged in fraud against the corporation. *In re CBI Holding Co., Inc.*, 311 B.R. 350, 373 (S.D.N.Y. 2004), *reversed in part on other grounds by In re CBI Holding Co., Inc.*, 529 F.3d 432, 438 (2d Cir. 2008). Pursuant to this rule, an agent's knowledge is imputed to the corporation because the "principal and agent are one and the same." *In re Mediators, Inc.*, 105 F.3d at 827.

In applying the sole-actor rule, other courts have considered the presence of innocent decision-makers. Some have determined that

---

[5]At least one court has concluded that the adverse interest exception is either an exception to the general rule of imputation or an exception to the *in pari delicto* defense because the outcome is the same in either case. *American Intern. Group, Consol. Deriv. Lit.*, 976 A.2d 872, 891 n.50 (Del. Ch. 2009). While we recognize that the distinction may indeed be irrelevant, we conclude that the appropriate analysis requires courts to consider the adverse interest exception as a means of rebutting the presumption that an agent's acts are imputed to the corporation. Imputation is the first step in analyzing whether a defendant has an *in pari delicto* defense.

the existence of innocent decision-makers is irrelevant, *Baena v. KPMG LLP*, 453 F.3d 1, 8-9 (1st Cir. 2006), while others examine the amount of authority bestowed on the corporate agent, *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709-10 (S.D.N.Y. 2001). Still others look to the control the innocent decision-maker had to thwart the fraud, concluding that when an innocent party had the power to stop the wrongdoing, the corporation and the agency are not one and the same. *In re 1031 Tax Group, LLC*, 420 B.R. 178, 202-03 (Bankr. S.D.N.Y 2009); *CBI Holding Co.*, 311 B.R. at 373. Because the sole-actor rule operates to impute conduct otherwise subject to the adverse interest exception when the corporation and its agent are indistinguishable from each other, we conclude that the presence of innocent decision-makers is only relevant to assess whether there is indeed a sole actor. If some corporate decision-makers are unaware of wrongdoing then there exists no unity between the agent and the corporation such that the agent's complete adversity will impute to the corporation.

> *Application of the in pari delicto doctrine in the instant case*

In evaluating the pleadings in this case to determine whether the actions of AMERCO's officers are imputed to AMERCO, we "recognize all factual allegations in [the] complaint as true and draw all inferences in [the plaintiff's] favor." *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). Applying basic corporate agency law, the respondents' actions are imputed to AMERCO unless the adverse interest exception applies. However, the plaintiffs did not allege that any respondent totally abandoned AMERCO's interests. Instead, they allege that respondent AMERCO's officers and directors initiated and participated in a variety of actions that clearly benefited them. But the corporation was not completely harmed by the transactions, as it acquired a management interest in the self-storage facilities, and the corporation retained a fee for its role in the operation of those facilities. Furthermore, it is not alleged that the respondent officers and directors acted solely for their own benefit. In light of our narrow construction of the adverse interest exception, we conclude that these allegations show less-than-total abandonment of AMERCO's interests. Because the adverse interest exception does not apply, we need not address the sole-actor rule.

Having determined that the acts of AMERCO's agents are imputed to AMERCO does not end our inquiry into the *in pari delicto* defense. To assess whether the *in pari delicto* defense precludes a derivative suit here requires application of the factors set

forth in *Shimrak*, 112 Nev. at 252, 912 P.2d at 826. In that case, we noted that

> "the courts should not be so enamored with the latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault, and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied."

*Shimrak*, 112 Nev. at 252, 912 P.2d at 826 (alterations in original) (quoting *Magill*, 74 Nev. at 386, 333 P.2d at 719). Other courts have similarly noted that there are public policy grounds for not applying *in pari delicto* as a bar to an action among wrongdoers. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (holding that, in the context of a federal securities law, public policy must be considered before allowing an *in pari delicto* defense); *American Intern. Group*, 976 A.2d at 883. We determine that whether the defense of *in pari delicto* should apply here is an issue for the district court to decide following necessary discovery and briefing that properly evaluates the factors to be considered for the defense. Thus, we remand this matter to the district court for further proceedings.

### Respondents' arguments regarding alternative grounds for affirmance

Although the district court dismissed appellants' amended complaint based solely on the *Goldwasser* settlement and its determination that appellants could not pursue claims against the SAC entities, respondents also argued other grounds for dismissing appellants' amended complaint, which they now offer on appeal as alternate rationales for affirming the district court's order. Since these alternate grounds were raised in the district court below, we have elected to address these issues on appeal. *See Nevada Power Co. v. Haggerty*, 115 Nev. 353, 365 n.9, 989 P.2d 870, 877 n.9 (1999).[6]

---

[6]On appeal, respondents also claim that dismissal is proper because the AMERCO shareholders ratified the SAC transactions. Ratification was the subject of a motion to dismiss in 2007, but the district court denied it because there were genuine issues of material fact regarding the sufficiency of the disclosure regarding those transactions. The district court did not again consider this ratification defense. However, respondents now request that we take judicial notice of public filings filed in 2008, after the district court's latest dis-

*Appellants adequately pleaded demand futility*

In 2003, the district court granted respondents' motion to dismiss on the ground that appellants had not adequately pleaded demand futility pursuant to NRCP 23.1. *See Shoen v. SAC Holding Corp.*, 122 Nev. 621, 631, 137 P.3d 1171, 1178 (2006). On appeal, we clarified the requirements for pleading demand futility and reversed and remanded the matter to the district court. *Id.* at 644-45, 137 P.3d at 1186-87. Appellants filed an amended complaint, and nominal defendant AMERCO filed a motion to dismiss, arguing that appellants still had not met NRCP 23.1's pleading requirements. In denying the motion, the district court determined that appellants "satisfied the heightened pleading requirements of demand futility by showing a majority of the members of the AMERCO Board of Directors were interested parties in the SAC transactions."

Respondents argue that the district court applied the wrong demand futility test and, thus, an alternate ground upon which we should affirm the district court's subsequent order granting the motions to dismiss is that appellants failed to meet the pleading requirements set forth in *Shoen*. We disagree.

Persons filing shareholder derivative suits face a heightened pleading requirement pursuant to NRCP 23.1. *Shoen*, 122 Nev. at 633, 137 P.3d at 1179. NRCP 23.1 requires shareholders to "state, with particularity, the demand for corrective action that the shareholder made on the board of directors . . . and why he failed to obtain such action, *or* his reasons for not making a demand." *Id.* at 633-34, 137 P.3d at 1179 (emphasis added). Failure to satisfy the heightened pleading requirement "justifies dismissal of the complaint for failure to state a claim upon which relief may be granted." *Id.* at 634, 137 P.3d at 1180.

To determine whether demand upon the board is excused, we apply standards articulated by the Delaware Supreme Court in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); and *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). *See Shoen*, 122 Nev. at 644, 137 P.3d at 1186. The *Aronson* test applies "[w]hen the alleged wrongs constitute a business decision by the board of directors." *Shoen*, 122 Nev. at 636, 137 P.3d at 1181

---

missal order, which they claim cure the earlier factual issues. We decline to consider this ratification issue as it was not properly before the district court, and we decline to address an issue raised for the first time on appeal. *See Mainor v. Nault*, 120 Nev. 750, 770 n.42, 101 P.3d 308, 321 n.42 (2004).

(emphasis omitted). The *Rales* test, on the other hand, is the appropriate "demand futility analysis for when the board considering a demand is not implicated in a challenged business transaction." *Shoen*, 122 Nev. at 638-39, 137 P.3d at 1183. As we previously recognized, appellants in this case "do not challenge any board-considered business decision. Therefore, the *Rales* test applies." *Id.* at 641, 137 P.3d at 1184-85.

Under the *Rales* test, we evaluate whether particularized facts in the shareholder derivative complaint "raise[ ] a reasonable doubt that the current board of directors would be able to exercise its independent and disinterested business judgment in responding to a demand." *Id.* at 642, 137 P.3d at 1185. Directors' impartiality can be shown through allegations demonstrating "that the majority is 'beholden to' directors who would be liable." *Id.* at 639, 137 P.3d at 1183 (quoting *Rales*, 634 A.2d at 936). Additionally, director interestedness can be demonstrated through alleged facts indicating that "a majority of the board members would be 'materially affected, either to [their] benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders.' " *Id.* (alteration in original) (quoting *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995)). A shareholder's "[a]llegations of mere threats of liability through approval of the wrongdoing or other participation" is not enough to satisfy the demand futility pleading requirements. *Id.* at 639-40, 137 P.3d at 1183.

At the time that appellants filed their shareholder derivative suit, eight persons composed AMERCO's board of directors: Joe, James, Bayer, Carty, Dodds, Brogan, Grogan, and M. Frank Lyons.[7] We previously determined that "it is clear that [Joe and James] are interested for demand futility purposes." *Id.* at 643 n.65, 137 P.3d at 1185 n.65. Consequently, now we must evaluate whether appellants have adequately alleged that at least two additional directors lack independence and impartiality. *See Beneville v. York*, 769 A.2d 80, 86 (Del. Ch. 2000) (holding that demand is not required when half of the members of an even-numbered board are interested).

> *Additional directors are allegedly interested and lack independence*

We conclude that appellants adequately alleged that three other directors—Bayer, Carty, and Dodds—lack disinterestedness and

---

[7]Lyons is not a party to this case.

independence.[8] In the amended complaint, appellants alleged that when Bayer served as the president of AMERCO's real estate subsidiary AREC, he gave approval for the sale of approximately 100 properties to the SAC entities at unfair prices. Also as AREC's president, appellants alleged that Bayer "used AREC's human resources and offices to help Mark Shoen and the SAC entities locate, obtain and develop valuable self-storage properties without compensation, without disclosing these arrangements to AMERCO's stockholders." Moreover, appellants alleged that Bayer was a director of another AMERCO subsidiary, and he "approved over $100 million in non-recourse loans" from that subsidiary to the SAC entities, which were then used to purchase the properties from AREC. Appellants further asserted that Bayer "knowingly signed incomplete and misleading annual reports" that "concealed the nature and scope of AMERCO's dealings with the SAC [e]ntities."

With regard to Carty and Dodds, appellants alleged in their amended complaint that while acting as directors of U-Haul, the two board members authorized millions of dollars in nonrecourse loans to the SAC entities, and, in their roles as directors of AREC, they consented to the sale of hundreds of properties to the SAC entities. Additionally, appellants alleged that, like Bayer, Carty and Dodds signed false annual AMERCO reports.

Appellants further alleged that Carty is not impartial because he is Joe and Mark's uncle, even becoming like a "father figure" to them. *See Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (stating that "[c]lose familial relationships between directors can create a reasonable doubt as to impartiality"). Appellants also contended that Carty "repeatedly encouraged [Joe, James, and Mark] to 'funnel' money out of AMERCO on a pre-tax basis." Throughout the family feud for control over AMERCO, appellants alleged, Carty consistently aligned himself with Joe and Mark. In fact, according to appellants, Joe placed Carty back on the AMERCO board of directors after a different Shoen brother had fired him.

Regarding Dodds, appellants further alleged that he has a "close, bias-producing relationship with [Joe Shoen]." According

---

[8]Our dissenting colleague acknowledges that the parties do not address whether demand futility should be assessed based on the composition of the board in place in 2002 when the original complaint was filed, or in 2006 when the amended complaint was filed, citing *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006). However, the parties did not address this issue, and we will not discuss an issue not raised on appeal. *See* NRAP 28; *see also Bongiovi v. Sullivan*, 122 Nev. 556, 569 n.5, 138 P.3d 433, 444 n.5 (2006).

to appellants, Dodds fervently supported Joe during the Shoen family feud and, when Joe attempted to take over AMERCO by issuing stock to trustworthy employees who then allowed him to vote their shares, he selected Dodds as one of the employees to purchase stock. However, appellants alleged, Dodds could not afford to purchase the stock, so Joe and the AMERCO board loaned him the money.

Further allegations in the amended complaint included that Joe, James, and Mark "dominate and control the AMERCO Board" and that they have "pack[ed] the AMERCO Board with loyal subordinates." Appellants also alleged that Joe, James, and Mark were in a position to manipulate Bayer, Carty, and Dodds because the former group of men have the power to fire the latter group and discontinue their salaries and pension benefits. Appellants contended that in the past, Joe retaliated against directors that took positions adverse to his.

In accepting appellants' allegations as true, *see Shoen*, 122 Nev. at 635, 137 P.3d at 1180, it appears that Joe and James have considerable influence over Bayer, Carty, and Dodds, raising reasonable doubts as to their ability to exercise independent and disinterested business judgment in responding to a demand. Construing the amended complaint liberally with all fair inferences made in favor of appellants, *see id.*, we conclude that appellants have alleged sufficient facts demonstrating that demand upon the board would have been futile, as at least five directors were interested or lacked impartiality—James, Joe, Bayer, Carty, and Dodds.[9]

---

[9]Respondents request this court to take judicial notice of a bankruptcy court's findings "that 'the appointment [of AMERCO's officers and directors] is consistent with the interests of the creditors and the equity security holder[s] and with public policy.' " Respondents argue that this finding demonstrates the independence of the AMERCO board of directors. Respondents also contend that the bankruptcy court addressed the fairness of the SAC transactions.

We may take judicial notice of facts that are "[g]enerally known within the territorial jurisdiction of the trial court," as well as those that are "[c]apable of accurate and ready determination . . . [and] not subject to reasonable dispute." NRS 47.130(2). Several courts have concluded that "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *accord Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001); *Southern Cross Overseas v. Wah Kwong Shipping*, 181 F.3d 410, 426 (3d Cir. 1999). However, generally, this court will not take judicial notice of facts in a different case, even if connected in some way, unless the party seeking such notice demonstrates a valid reason for doing so. *Mack v. Estate of Mack*, 125 Nev. 80, 91, 206 P.3d 98, 106 (2009)

In *Shoen*, we noted that "[i]f the district court should find the pleadings provide sufficient particularized facts to show demand futility, it must later conduct an evidentiary hearing to determine, as a matter of law, whether the demand requirement nevertheless deprives the shareholder of his or her standing to sue." *Id.* at 645, 137 P.3d at 1187. Thus, on remand, this matter should be scheduled for an evidentiary hearing to determine whether demand was, in fact, futile.[10]

## *Some of appellants' causes of action were pleaded sufficiently*

Respondents contend that an additional alternate ground upon which this court should affirm the district court's order is that appellants failed to state claims upon which relief can be granted. The claims against all of the respondents are: (1) engaging in

---

(holding that this court will generally not take judicial notice of records in other matters); *Carson Ready Mix v. First Nat'l Bk.*, 97 Nev. 474, 476, 635 P.2d 276, 277 (1981) (providing that this court will not consider evidence not appearing in the record on appeal); *Occhiuto v. Occhiuto*, 97 Nev. 143, 145, 625 P.2d 568, 569 (1981) (recognizing general rule but holding that the close relationship between the case and a previous divorce proceeding justified the district court taking judicial notice of the prior proceeding). We conclude that the bankruptcy court's alleged findings that the AMERCO board was independent and that the SAC transactions were fair are not appropriate matters of which this court may take judicial notice.

Our dissenting colleague points to the bankruptcy court's findings in the context of analyzing demand futility. However, the dissent overlooks a provision in the bankruptcy plan that expressly allowed appellants' derivative claims to proceed after the plan was approved:

> Notwithstanding anything in this Plan to the contrary, the Confirmation of this Plan shall not (i) enjoin, impact or affect the prosecution of the Derivative Actions . . . .

"Derivative Actions," as defined by the reorganization plan, specifically include the matters that resulted in this appeal. As a consequence, it is clear that the bankruptcy court order provides no basis for resolving whether the directors were interested for purposes of demand futility.

[10]Respondents contend that this court should affirm the district court's order because appellants have not overcome the presumption that respondents acted in good faith. Pursuant to Nevada's business judgment rule set forth in NRS 78.138, directors and officers benefit from the "'presumption that in making a business decision [they] . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Shoen*, 122 Nev. at 632, 137 P.3d at 1178-79 (quoting *Aronson*, 473 A.2d at 812). However, the business judgment rule cannot be invoked by directors, where, as alleged here, they were not asked to consider the issue, *Aronson*, 473 A.2d at 812, nor can respondents rely on the business judgment rule as to directors Bayer, Carty, and Dodds when the board was not asked to consider the SAC entity transactions. *Id.* at 816. Thus, we determine that the business judgment rule does not provide this court an alternative ground upon which to affirm the district court's dismissal.

ultra vires acts, (2) wrongful interference with AMERCO's prospective economic advantage, and (3) abuse of control.[11] The appellants also claimed: (1) breach of the fiduciary duty of loyalty by engaging in self-dealing against all of the former directors, (2) aiding and abetting a breach of the fiduciary duty of loyalty against the SAC entities, (3) usurpation of corporate opportunities against Mark, and (4) unjust enrichment against the SAC entities.

Before addressing each cause of action, we necessarily note that appellants' claims are subject to different pleading standards. Pursuant to NRS 78.138(7), to show that a director breached his or her fiduciary duty, a shareholder must prove that the director's "act or failure to act constituted a breach of his or her fiduciary duties" and that the "breach of those duties involved intentional misconduct, fraud or a knowing violation of the law." NRCP 9(b) provides, in pertinent part, that "[i]n all averments of fraud[,] . . . the circumstances constituting fraud . . . shall be stated with particularity." Because appellants' claims of breach of the fiduciary duty are, in this instance, allegations of fraud committed by respondent officers and directors, for those causes of action, appellants must satisfy the heightened pleading requirement of NRCP 9(b). For all other causes of action, appellants need only satisfy the more liberal pleading requirements of NRCP 8(a) ("a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief").

### Breach of fiduciary duty of loyalty/usurpation of corporate opportunities

Appellants' first and second causes of action in the amended complaint contained allegations that respondents breached the fiduciary duty of loyalty by self-dealing and usurping corporate opportunities, and, with regard to the SAC entities, aiding and abetting a breach of fiduciary duty. "[T]he duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interests over anyone else's interests." *Shoen*, 122 Nev. at 632, 137 P.3d at 1178. As noted, to hold "a

---

[11]Nevada does not recognize a cause of action for abuse of control, and in the cases to which appellants cite, claims for abuse of control are essentially claims for breach of the fiduciary duty of loyalty. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (stating that directors owe "shareholders an uncompromising duty of loyalty"); *see also Jones v. H.F. Ahmanson & Company*, 460 P.2d 464, 471 (Cal. 1969) (acknowledging that majority shareholders "have a fiduciary responsibility to the minority and to the corporation"). Accordingly, we conclude that appellants' claim of abuse of control is duplicative of their claim of breach of the fiduciary duty of loyalty and need not be separately addressed.

director or officer . . . individually liable,'' the shareholder must prove that the director's breach of his or her fiduciary duty of loyalty "involved intentional misconduct, fraud or a knowing violation of law." NRS 78.138(7)(b); *see also Shoen*, 122 Nev. at 640, 137 P.3d at 1184. Appellants' allegations can be divided into four groups of defendants.

### Mark Shoen

In the amended complaint, appellants first alleged that Mark, one of AMERCO's executive officers, was materially self-interested in the transfer of AMERCO assets and opportunities to the SAC entities due to his ownership and control of the SAC entities. Appellants contended that Mark breached his fiduciary duty of loyalty, placing his own interests above those of AMERCO, when he caused AMERCO to sell property to SAC entities at below-market prices and usurped corporate opportunities that he had learned about as an officer of AMERCO, "by causing the SAC [e]ntities . . . to buy [self-storage] properties" despite his knowledge that AMERCO would have been interested in the properties and without obtaining disinterested director approval. Considering the accusations to be true, we determine that appellants have set forth claims upon which relief can be granted, based on a breach of the fiduciary duty of loyalty by Mark.

### Joe and James Shoen

Appellants further alleged in the first cause of action in the amended complaint that Joe and James retained an undisclosed pecuniary interest in the SAC entities and that their self-interest in the SAC transactions was increased through their familial ties to Mark. However, appellants offered no explanation as to why or how Joe and James personally benefited from the diversion of AMERCO's assets to a company owned by Mark, other than to suggest that the sale of their SAC-entity shares to Mark was below-market, which infers that they secretly retained an interest in the entities. We conclude that merely alleging that Joe and James benefited because they had an interest in aiding their brother and might have a continued pecuniary interest of some sort fails to meet the heightened pleading standard in NRCP 9(b). Thus, respondents are correct that the claim in the first cause of action in the amended complaint was properly dismissed as to Joe and James, albeit for incorrect reasons. *See LVCVA v. Secretary of State*, 124 Nev. 669, 689 n.58, 191 P.3d 1138, 1151 n.58 (2008) ("[W]e will affirm the dis-

trict court if it reaches the right result, even when it does so for the wrong reason.'').

> *Bayer, Carty, Dodds, Herrera, Johnson, Brogan, and Grogan*

Appellants alleged that Bayer, Carty, Dodds, Herrera, Johnson, Brogan, and Grogan breached their duty of loyalty ''by knowingly orchestrating, participating, facilitating and aiding and abetting the self-dealing transactions.'' In particular, appellants alleged that these respondents ''knowingly signed misleading and incomplete public filings'' that failed to include the details of the SAC transactions. Appellants contended that Bayer, Carty, Dodds, Herrera, Johnson, Brogan, and Grogan knew the filings were false because, as members of the boards of various AMERCO subsidiaries, they approved loans to the SAC entities and were aware of the details of the transactions. However, simply alleging that the public filings did not contain enough information about the SAC entities does not demonstrate that respondents engaged in intentional misconduct or fraud. Given the statutory requirements of NRCP 9(b), we determine that appellants' claim in the first cause of action in the amended complaint of a breach of the fiduciary duty of loyalty by Bayer, Carty, Dodds, Herrera, Johnson, Brogan, and Grogan was not pleaded with sufficient particularity and was correctly dismissed.

## *The SAC entities*

The SAC entities allegedly aided and abetted the other respondents' breaches of fiduciary duty. Although we have not previously recognized a claim for aiding and abetting the breach of a fiduciary duty, we take this opportunity to do so. We adopt the standard applied by Delaware courts, which requires that four elements be shown: (1) a fiduciary relationship exists, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach of the fiduciary relationship resulted in damages. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

The extent of appellants' allegation was that ''[t]he SAC [e]ntities (acting through Defendant [Mark Shoen]) knowingly participated in the breaches of fiduciary duties by facilitating the transfer of AMERCO's assets at below-market prices.'' However, because Mark owns and controls the SAC entities, we conclude that appellants have sufficiently satisfied the elements enunciated in

*Malpiede.* Thus the appellants' claim against the SAC entities for aiding and abetting respondents' breach of the fiduciary duty of loyalty was improperly dismissed.

*Appellants failed to adequately plead a cause of action for ultra vires acts*

Appellants' third cause of action pleaded in their amended complaint was based on respondents engaging in ultra vires acts. We previously stated that "a corporate act is said to be ultra vires when it goes beyond the powers allowed by state law or the [corporation's] articles of incorporation." *Shoen*, 122 Nev. at 643, 137 P.3d at 1185. However, " '[i]f . . . the [corporation's] act was within the corporate powers, but was performed without authority or in an unauthorized manner, the act is not ultra vires.' " *Id.* at 643, 137 P.3d at 1186 (alterations in original) (quoting *Sammis v. Stafford*, 56 Cal. Rptr. 2d 589, 593 (Ct. App. 1996)).

In the amended complaint, appellants alleged that AMERCO acted in violation of its articles of incorporation when it transacted business with the SAC entities without obtaining shareholder approval prior to consummating the transactions. Because AMERCO's articles of incorporation permit such actions as long as shareholder approval is obtained, such actions were "unauthorized" but not ultra vires. Appellants failed to demonstrate otherwise. Thus, we conclude that appellants' cause of action for ultra vires acts must be dismissed.

*Wrongful interference with prospective economic advantage*

Appellants next allege wrongful interference with prospective economic advantage, against all respondents. Interference with prospective economic advantage requires appellants to demonstrate the following five factors:

> (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

*Wichinsky v. Mosa*, 109 Nev. 84, 87-88, 847 P.2d 727, 729-30 (1993).

In their amended complaint, appellants alleged that "AMERCO had prospective economic or contractual relationships with cus-

tomers who would have rented self-storage units in U-Haul facilities," as well as "with third parties who owned and sold properties which could be used as self-storage locations." Appellants further alleged that respondents were aware of these prospective economic relationships and "acted for the benefit of the SAC [e]ntities, with the intent to harm AMERCO." Also, appellants pointed to the sale of AMERCO properties to the SAC entities at allegedly unfairly low prices, which prevented AMERCO from realizing the amount of profit it would have obtained from selling to outsiders. Finally, appellants alleged that AMERCO and its shareholders have suffered irreparable harm as a result.

Unlike the claims of breach of fiduciary duty, appellants' claim for wrongful interference with prospective economic advantage is not based on fraud; thus, it is not subject to the heightened pleading requirement in NRCP 9(b). Accepting as true each of the appellants' particularized factual allegations and drawing every fair inference in their favor, appellants satisfied the general pleading requirement of NRCP 8(a).[12] Therefore, we determine that appellants have set forth a claim in the fourth cause of action of the amended complaint of wrongful interference with prospective economic advantages upon which relief could be granted.

### Unjust enrichment

Appellants' next cause of action is for unjust enrichment against the SAC entities. "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Nevada Industrial Dev. v. Benedetti*, 103 Nev. 360, 363 n.2, 741 P.2d 802, 804 n.2 (1987).

Appellants alleged in the amended complaint that "the SAC [e]ntities have received, and they retain, money and property of AMERCO." The SAC entities allegedly accomplished this through transactions that they entered into with AMERCO. Under the more liberal pleading requirements of NRCP 8(a), we conclude that appellants' unjust enrichment claim was pleaded sufficiently.

---

[12]Our dissenting colleague argues that because we dismissed the breach of fiduciary duty claims against the directors, we must also dismiss the wrongful interference claims. In reaching this conclusion, the dissenting justice contends that a wrongful interference claim fails if the plaintiff does not present sufficient evidence that the director's actions overcome the business judgment presumption. While we do not dismiss this analysis, the parties did not brief this argument on appeal, and it is thus not properly before this court. *See* NRAP 28; *see also Bongiovi v. Sullivan*, 122 Nev. 556, 569 n.5, 138 P.3d 433; 444 n.5 (2006).

*Whether appellants' claims are barred by the statute of limitations*

The final ground upon which respondents urge this court to affirm the district court's order is that the statute of limitations for appellants' claims has expired. If the allegations contained in the amended complaint demonstrate that the statute of limitations has run, then dismissal upon the pleadings is appropriate. *See Shupe & Yost, Inc. v. Fallon Nat'l Bank*, 109 Nev. 99, 100, 847 P.2d 720, 720 (1993).

Appellants' initial two causes of action alleged a breach of the fiduciary duty. A breach of fiduciary duty is analogous to fraud, and thus, Nevada applies the three-year statute of limitation set forth in NRS 11.190(3)(d). *Nevada State Bank v. Jamison Partnership*, 106 Nev. 792, 799, 801 P.2d 1377, 1382 (1990). The statute of limitations for a claim for breach of fiduciary duty does not begin "to run until the aggrieved party knew, or reasonably should have known, of the facts giving rise to the breach." *Id.* at 800, 801 P.2d at 1382. When a fiduciary "fails to fulfill his obligations" and keeps that failure hidden, the statute of limitations will not begin to run until the failure of the fiduciary is "discovered, or should have been discovered, by the injured party." *Golden Nugget, Inc. v. Ham*, 95 Nev. 45, 48-49, 589 P.2d 173, 175 (1979). "Mere disclosure of a transaction by a director, without disclosure of the circumstances surrounding the transaction, is not sufficient, as a matter of law, to commence the running of the statute." *Id.* at 48, 589 P.2d at 175.

Appellants' claim for wrongful interference with prospective economic advantage is subject to a four-year statute of limitations. *See* NRS 11.190(2)(c); *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 781 (9th Cir. 2002) (applying Nevada law and concluding that a claim for "intentional interference with prospective business relations [is] subject to Nevada's four-year limitations period"). The statute of limitation for an unjust enrichment claim is four years. NRS 11.190(2)(c).

A determination of " '[w]hen the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action is a question of fact for the trier of fact.' " *Nevada State Bank*, 106 Nev. at 800, 801 P.2d at 1382 (quoting *Oak Grove Inv. v. Bell & Gossett Co.*, 99 Nev. 616, 623, 668 P.2d 1075, 1079 (1983), *overruled on other grounds by Calloway v. City of Reno*, 116 Nev. 250, 264, 993 P.2d 1259, 1268 (2000), *overruled on other grounds by Olson v. Richard*, 120 Nev. 240, 89 P.3d 31 (2004)). Because, here, the pleadings are suffi-

cient to create a question of fact regarding whether the statute of limitations had run, and the district court never reached this issue, we conclude that the question of whether the statute of limitations has run against all of appellants' viable claims must be considered on remand.[13]

## CONCLUSION

In conclusion, the *Goldwasser* settlement did not release claims that arose after the agreement because the claim release clause only released those claims that existed at the time of the settlement. Additionally, while the acts of AMERCO's agents are imputed to AMERCO, the *in pari delicto* defense may not preclude appellants from bringing claims against respondents. We remand to the district court to examine the factors in *Shimrak* and determine whether the *in pari delicto* defense applies. We also remand to the district court to conduct an evidentiary hearing to determine whether demand was futile.

As to the alternative grounds for affirming the district court, we affirm in part and reverse in part. As to Mark, we conclude that the appellants sufficiently pleaded a breach of the fiduciary duty of loyalty, usurpation of corporate opportunities, and wrongful interference with prospective economic advantage. Appellants also sufficiently pleaded breach of the fiduciary duty of loyalty for aiding and abetting a breach, wrongful interference with prospective economic advantage, and unjust enrichment against the SAC entities. As to the other respondents, appellants sufficiently pleaded wrongful interference with prospective economic advantage. Therefore, we reverse the district court's dismissal of these claims. As to all other claims, we conclude that appellants did not sufficiently plead them and the district court correctly dismissed them.

Accordingly, we affirm in part and reverse in part the district court's order and remand this matter for proceedings consistent with this opinion.

DOUGLAS, C.J., and CHERRY, SAITTA, GIBBONS, and PARRAGUIRRE, JJ., concur.

PICKERING, J., concurring in part and dissenting in part:

In *Shoen v. SAC Holding Corp.*, 122 Nev. 621, 137 P.3d 1171 (2006) (*Shoen I*), this court reversed an order dismissing this case for not adequately pleading demand futility and remanded with

---

[13]Appellants request that this court reassign the matter to a different judge upon remand, arguing that "Judge Adams' successive dismissals demonstrate that he has prejudged this case." However, appellants fail to cite any basis for disqualification under the Nevada Code of Judicial Conduct, and thus, we conclude that reassignment is not warranted.

specific instructions: (1) to the plaintiffs to file an amended complaint; and (2) to the district court to decide whether, under *Shoen I*, the amended complaint adequately pleaded demand futility. Now the case returns, this time on an order dismissing the claims in the amended complaint as precluded by the *Goldwasser* settlement and the *in pari delicto* doctrine. I agree with the majority that neither the *Goldwasser* settlement nor the *in pari delicto* doctrine precludes this suit at the pleading stage as a matter of law. I also agree with its NRCP 12(b)(5) dismissal of certain claims for relief and with its direction to the district court to conduct further proceedings with respect to demand futility. However, I write separately to address the claims remaining in the case and the scope of the proceedings on remand with respect to demand futility and related issues.

## 1. *Dismissal of the wrongful interference claims*

The majority dismisses under NRCP 9(b) and NRCP 12(b)(5) all of the claims asserted against the individual directors except the wrongful interference with prospective economic advantage claim. I would go further and dismiss the wrongful interference claim as well. "It is hornbook law that the actions complained of in a claim for intentional interference with prospective advantage must be wrongful." *Panter v. Marshall Fields & Co.*, 646 F.2d 271, 298 (7th Cir. 1981). Indeed, the very name of the tort is "*wrongful* interference with prospective economic advantage." *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 88, 734 P.2d 1221, 1225-26 (1987). The "wrongfulness" alleged in the amended complaint to sustain this claim against the individual directors derives entirely from their alleged breaches of fiduciary duty in connection with the SAC transactions. If, as the majority concludes, the amended complaint fails to plead sufficient facts to overcome the presumption of the business judgment rule as to the breach of fiduciary duty claims—appropriately, given the broadly exculpatory provisions in AMERCO's organizational documents, *see Wood v. Baum*, 953 A.2d 136, 140-41 (Del. 2008); *see also* NRS 78.138(7)—the wrongful interference claims also fail. *Cf. Panter*, 646 F.2d at 299 ("In the absence of sufficient evidence that the directors acted improperly to overcome the presumption of the business judgment rule, a case cannot proceed to the jury on an interference with prospective economic opportunity theory.").

## 2. *Proceedings on remand*

I cannot agree with the majority that the amended complaint adequately alleges demand futility and would instead remand with instructions to the district court to conduct the analysis ordered in

*Shoen I.*[1] In my opinion, it is imprudent for this court to conduct that analysis in the first instance under the unique circumstances presented here.

"Demand futility analysis is conducted on a claim-by-claim basis." *Beam ex rel. M. Stewart Living v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003). The dismissal of most, if not all, of the claims against the individual directors has a large potential impact on the demand futility analysis. The briefing that was done on demand futility was filed in the district court in 2006 and 2007 and in this court in 2009. Although not addressed by the parties, it is not even clear whether, given the dismissal and subsequent amendment in 2006 of the complaint, demand futility should be assessed as of 2002, when the original complaint was filed, or 2006, when the amended complaint was filed. *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) ("Where a complaint is amended with permission following a dismissal without prejudice, even if the act or transaction complained of in the amendment is essentially the same conduct that was challenged in the original dismissed complaint, the Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed.").

It appears from the amended complaint that this is a type of double-derivative suit,[2] where, to excuse demand, the complaint must allege facts that create "a reasonable doubt that a majority of the Board would be disinterested or independent *in making a decision on a demand.*" *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993) (emphasis added). The focus in this type of case is not on "the challenged transaction or the directors' interest in that transaction, but rather on the directors' interest in the decision about whether to sue." *Waber v. Dorman*, 2011 WL 814992, at *4 (N.D. Ill. Feb. 23, 2011) (applying Delaware law and discussing *Rales*).

---

[1] The district court's determination that being named defendants in this suit makes the directors sufficiently "interested" as to excuse demand is clearly erroneous and contrary to the law of this case. *Shoen I*, 122 Nev. at 640, 137 P.3d at 1184 ("interestedness because of potential liability can be shown only in those rare cases . . . where defendants' actions were so egregious that a substantial likelihood of director liability exists" (quotations omitted)). Particularly is this so given the dismissal of most, if not all, of the claims asserted in the amended complaint against the individual directors.

[2] The amended complaint alleges indirect injury to the parent, AMERCO, in which the plaintiffs have an interest, as a result of alleged direct injuries to its subsidiaries, AREC and U-Haul. Recent Delaware cases, on whose demand futility law we relied in *Shoen I*, holds that "in a double derivative action involving a wholly owned subsidiary, a stockholder plaintiff only must plead demand futility (or otherwise satisfy Rule 23.1) at the parent level." *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1207 (Del. Ch. 2010) (discussing *Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010)).

''[I]t is a fundamental principle of corporate governance that the directors of a corporation and not its shareholders manage the business and affairs of the corporation.'' 13 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5963, at 60 (West 2004). Among the matters entrusted to a corporation's directors is the decision to litigate—or not to litigate—a claim by the corporation against third parties. *Id.*; *In re Citigroup, Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 120 (Del. Ch. 2009). Allowing a derivative suit to proceed without demand reallocates the authority to decide whether to sue from the board to the individual shareholder or shareholders who sue derivatively. To justify this reallocation of decision-making authority, a derivative action complaint must comply with NRCP 23.1 and ''allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.'' While ''[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, . . . conclusory allegations are not considered as expressly pleaded facts or factual inferences.'' *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

Although *Shoen I* obviously did not address the yet-to-be-filed amended complaint, its suggestion that demand futility be determined under the test articulated in *Rales* remains appropriate. *Shoen I*, 122 Nev. at 641-42, 137 P.3d at 1185. ''*Rales* requires that a majority of the board be able to consider and appropriately to respond to a demand 'free of personal financial interest and improper extraneous influences.' Demand is excused as futile [only] if the Court finds that there is 'a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on demand.' '' *Beam*, 833 A.2d at 977 (quoting *Rales*, 634 A.2d at 930, 935). A director is not ''disinterested'' if ''he or she will receive a personal financial benefit from a transaction that is not equally shared by the shareholders'' or ''a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.'' *Rales*, 634 A.2d at 936. Lack of independence can be shown by alleging particular facts that support a reasonable inference that a director is so beholden to an interested party that his ''discretion would be sterilized.'' *Id.* While a close family relationship can disqualify a director—here, Joe Shoen and James Shoen, as to the derivative claims against their brother, Mark Shoen, 122 Nev. at 642 n.65, 137 P.3d at 1185 n.65—business, social, and more remote family relationships are not disqualifying, without more. *See Beam*, 833 A.2d at 981; 1 *Principles of Corp. Governance* § 1.26 (1994) (an uncle/nephew relationship does not establish the parties as members of one an-

other's immediate families, as child/parent or sibling relationships do).

The main claims that survive dismissal are those against Mark Shoen and the SAC entities. As to those claims, none of the directors except Joe Shoen and James Shoen appear disqualified by personal interest from fairly judging the suit demand. The issue that I would remand to the district court, therefore, is whether, as to those claims, the amended complaint pleads particularized facts sufficient to overcome the presumption that, in assessing that suit demand, the directors charged with doing so can be faithful to their fiduciary duties to AMERCO. *Beam*, 845 A.2d at 1048-49; *see In re Bear Stearns Companies, Inc.*, 763 F. Supp. 2d 423, 541 (S.D.N.Y. 2011) (applying Delaware law).

The surviving claims in the amended complaint, at their core, challenge the structural relationship between AMERCO, its subsidiaries, and the SAC special purpose entities. This structure and these relationships have been examined repeatedly, first by the United States District Court for the District of Arizona in *Goldwasser*, and more recently and much more comprehensively by the United States Bankruptcy Court for the District of Nevada in *In re: AMERCO*, No. BR-03-52103-GWZ (Bankr. D. Nev. 2004).[3] They have also, according to the briefs presented on appeal, been presented to and ratified by the company's shareholders.[4] The principal named plaintiff, Paul Shoen, served on the AMERCO board when some of the transactions he complains about in this derivative action occurred and, more importantly, when the business model the amended complaint challenges was set. While these facts do not establish claim or issue preclusion, they are significant, because they make it fair to expect considerably more particularity than the rote conclusory language from the demand futility caselaw that the amended complaint provides.

Given the unique and incontestable record facts, I would set the pleading bar higher than my colleagues do before subjecting this entity and its shareholders to derivative litigation. I am unconvinced that the conclusory, though prolix, allegations in the

---

[3]After plaintiffs filed the original complaint but before the amended complaint was filed, the United States Bankruptcy Court for the District of Nevada entered its 11 U.S.C. § 1129(a)(5) order in *In re AMERCO*, No. BR-03-52103-GWZ (Bankr. D. Nev. 2004), approving AMERCO's plan of reorganization. In this order, the Bankruptcy Court specifically found that the AMERCO board's composition "is consistent with the interests of creditors and equity security holders and with public policy," including, presumably, the requirements of applicable state and federal corporate law, to include the independence requirements under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7213, and the entity's listing stock exchange rules. *Id.*

[4]As the majority recognizes, this issue is potentially dispositive in this case but cannot be resolved by this court because it depends on the adequacy of disclosures not included in the record on appeal.

amended complaint clear that bar. There have been enough changes to the playing field, with the majority's dismissal of many claims in the amended complaint, AMERCO's reorganization, and the 2008 shareholder ratification, that I would remand for further briefing and argument on demand futility on the issues, among others, outlined above.

